| | | |
|---|---|---|
| TERRITA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-00025-CV-W-DGK |
| | ) | |
| DOUGLAS A. COLLINS, SECRETARY OF THE | ) | |
| DEPARTMENT OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

# MOTION OF THE SECRETARY OF VETERANS AFFAIRS
# FOR SUMMARY JUDGMENT
### (*With Supporting Suggestions and Statement of Uncontroverted Material Facts Incorporated*)

Jeffrey P. Ray
Acting United States Attorney


By        */s/ Jeffrey P. Ray*

Jeffrey P. Ray
Acting United States Attorney and Civil
Division Chief
Missouri Bar No. 35632

Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, MO 64106
(816) 426-3130 [Telephone]
(816) 426-3165 [Fax]
Jeffrey.Ray@usdoj.gov

ATTORNEYS FOR DEFENDANT
DOUGLAS A. COLLINS, in his official
capacity as the Secretary of Veterans Affairs

Pursuant to FED. R. CIV. P. 56 and W.D. MO. LOC. R. 7.0, 56.1(a), separate defendant Douglas A. Collins,[1] in his official capacity as the Secretary of Veterans Affairs ("the VA"), respectfully moves the Court to enter an order of summary judgment in favor of the VA and against plaintiff Territa Smith ("Smith") on the all claims of illegal discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e ("Title VII"), and the Age Discrimination in Employment Act, ,29 U.S.C. §§ 621, *et seq.* ("ADEA"), asserted in Smith's COMPLAINT AND JURY DEMAND [Doc. 1].

As detailed herein (and supported by evidence specifically referenced in the record attached hereto), the VA asserts that summary judgment in favor of the VA and against Smith is mandated in this case because the summary judgment record and relevant case law establish that:

(1)     Smith failed to exhaust administrative remedies for any claims of retaliation and constructive discharge,

(2)     Smith cannot establish a trialworthy issue of pretext as to her claims of race and age discrimination allegedly arising from two discrete employment actions taken by the VA, and

(3)     Smith cannot establish an actionable claim of a hostile work environment (or constructive discharge) under the controlling precedent.

As set out in more detail below, applying long-settled Eighth Circuit employment discrimination law, the material facts about which there are no genuine disputes establish as a matter of law the VA's entitlement to summary judgment.

---

[1]     When this case was initiated, Denis McDonough was the Secretary of Veterans Affairs. With the change in presidential administrations, however, Mr. McDonough resigned his position, and Mr. Collins was confirmed as the new Secretary of Veterans Affairs on February 5, 2025. Pursuant to FED. R. CIV. P. 25(d), "[w]hen a public officer who is a party to an appeal . . . resigns, . . . the action does not abate [and the] public officer's successor is automatically substituted as a party."

# I.    The VA's statement of uncontroverted material facts[2]

## A.   Overview

1.      Smith, an African American woman over the age of 40, was hired by the VA in January of 2021 as a Medical Instrument Technician ("MIT") in the Gastroenterology Unit ("the GI group") at the Kansas City VA Medical Center ("KCVAMC") in Kansas City, Missouri. DEPOSITION OF TERRITA SMITH, at 6:17-21, 18:20-25, 19:1-11 (attached as "Exhibit A").

2.      Smith was hired by Jeanine Wood, a Nurse Manager, at the KCVAMC. DEPOSITION OF JEANINE WOOD, at 8:4-12, 20:13-22 (attached as "Exhibit B").

3.      Ms. Wood was Smith's supervisor in the GI group. Ex. B, at 8:4-23, 9:6-8

4.      During the relevant time, Ms. Wood also had an Assistant Nurse Manager, Justin Scholl.   Ex. B, at 14:14-24.

5.      In the GI group, MITs "operate and monitor commonly used [medical] equipment performing routine procedures" such as colonoscopies and endoscopies, assists with scheduling and coordinating special procedures, preparation and logistics of patients and operation and maintenance of bio-medical equipment, and maintains adequate inventory of supplies. FUNCTIONAL STATEMENT, MEDICAL INSTRUMENT TECHNICIAN (GASTROENTEROLOGY) (attached as "Exhibit C").

6.      When not assisting in diagnostic procedures, MITs are "expected to answer phones, assist in the recovery/pre-operative area, answer patient questions," restock inventory, and perform "general administrative functions."   Ex. C.

---

[2]      The foregoing uncontroverted material facts are accompanied by citations to exhibits in the attached summary judgment record. FED. R. CIV. P. 56(c)(1)(A).   In the case of lengthy exhibits, particularly depositions and voluminous affidavits, the VA cites to and provides as exhibits hereto only "the relevant excerpts." W.D. MO. LOC. R. 56.1(d).

7.      Smith was hired pursuant to a one-year probationary period. Ex. A, at 60:18-20.

8.      During their probationary period, MITs are assigned to preceptors. Ex. A, at 25:3-7.

9.      Preceptors are experienced MITs who "know the job completely inside and out" and are trained in all areas. Ex. A, at 25:3-15, 33:13-19; Ex. B, at 22:3-6.

10.     Preceptor assignments for probationary MITs are routinely shuffled. Ex. A, at 25:16-23; Ex. B, at 41:7-10

## B.   Smith's EEO activity

11.     On August 11, 2021, after eight months at the KCVAMC, Smith initiated contact with the VA's EEO office complaining of workplace harassment. COUNSELOR REPORT (attached as "Exhibit D").

12.     After an informal resolution could not be reached, on October 26, 2021, Smith filed a formal administrative COMPLAINT OF EMPLOYMENT DISCRIMINATION. ADMINISTRATIVE COMPLAINT (attached as 'Exhibit E").

13.     In her administrative complaint, Smith expressly indicated that she was complaining of harassment/hostile work environment based on "Age (over 40)" and Race (Blk)." Ex. E.

14.     In her administrative complaint, Smith did not raise any other bases for alleged discrimination and specifically did not claim that she had been subjected to retaliation.   Ex. E.

15.     After reviewing Smith's administrative complaint, the VA informed Smith that it construed her complaint as raising 24 allegations of a hostile work environment, with two of the allegations also being treated as a discrete employment acts. NOTICE OF ACCEPTANCE (attached as 'Exhibit F").

16.     In the letter from the VA, Smith was further specifically informed:

> If you believe that the accepted claims are formulated improperly, incomplete, or incorrect, you must notify this office within seven (7) calendar days of receipt of this letter, in writing, by email, or fax, stating your disagreement. . . .   If you do not contact this office within 7 calendar days, we will assume that we correctly stated the claims.

Ex. F.

17.     Smith did not object to the scope of issues identified and the ensuing VA investigation focused on these 24 allegations identified in the administrative complaint.   Ex. F.

18.     In her current lawsuit, Smith assets that "[a]ll of Plaintiffs claims alleged in this Complaint were considered during the administrative investigation of her Complaint of Discrimination.". Doc. 1, at ¶¶ 12, 23-91.[3]

## 1.     In March 2021, Ms. Wood accused Smith her of not being with her preceptor at all times.

19.     In March of 2021, another MIT, Holly Oliver, was assigned as Smith's preceptor. Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3; Affidavit of Territa Smith, at ¶ 17 (attached as "Exhibit G").

20.     On one occasion, Smith was told to report to a Room One where a procedure was scheduled to take place. Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

21.     Smith reported to Room One but Ms. Oliver never arrived. Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

22.     Smith later learned that the patient had been relocated to an upstairs surgical room. Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

---

[3]     In light of the foregoing, the VA focuses on the 24 allegations raised by Smith and investigated by the VA. Because the bulk Smith's allegations are so trivial, the VA largely accepts Smith's bare allegations about the actions supposedly undertaken by the VA.

23.     Smith did not know where Ms. Oliver was so she went to another room to help with other procedures. Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

24.     Subsequently, Ms. Wood asked Smith why she was not with her preceptor and Smith stated that she "couldn't find Holly," she did not "know where Holly was," and only later "found out that Holly was in surgery upstairs." Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

25.     Ms. Wood told Smith to tell Ms. Oliver to report to her when Smith found her. Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

26.     According to Smith, when Ms. Oliver and she later reported to Ms. Wood, Ms. Wood scolded Smith for not "being with her preceptor at all times" but said nothing to Ms. Oliver.   Ex. A, at 25:24-25, 26:1-25, 27:1-25, 28:1-25, 29:1-3.

## 2.     Ms. Wood assigned Smith her duties and then forgot that she did so.

27.     According to Smith, on some occasions, Ms. Wood would assign Smith to a particular room and preceptor and the preceptor would say to Smith that she was supposed to be another room.   Ex. A, at 29:22-25, 30:1-18.

28.     Ms. Wood made the assignments by writing names and rooms on a centrally located whiteboard.   Ex. A, at 30:19-25, 31:1-9.

29.     On some occasions, her assigned preceptor would take Smith to another room and then change the whiteboard where MIT assignments were written down.   Ex. A, at 29:22-25, 30:1-18.

30.     When that happened, Ms. Wood would not say anything.   Ex. A, at 29:22-25, 30:1-18.

### 3. Smith was called out for being late to huddles.

31. In the mornings at 7:00 a.m., the entire GI group would meet in a huddle to what was scheduled for the day. Ex. A, at 34:2-11.

32. There were occasions when Smith was later to huddles because Smith could not find scrubs that fit and would have to go downstairs at the KCVAMC to get properly sized scrubs. Ex. A, at 34:12-24.

33. There were occasions where Smith was late to a huddle and Ms. Wood would say nothing. Ex. A, at 35:12-15.

34. On other occasions, Ms. Wood "would say things like 'Territa Smith, are you late?'" Ex. A, at 35:25, 36:1-9.

### 4. Smith's co-workers kept changing how they did procedures.

35. According to Smith, each preceptor to whom she was assigned "wanted the procedures to fit 'their' standards, rather than going by the book." Ex. G, at ¶ 38.

36. Smith complained to Ms. Wood about these procedure changes. Ex. G, at ¶ 38.

37. According to Smith, Ms. Wood told her to "do what your preceptors tell you to do." Ex. G, at ¶ 38.

### 5. On or about March 1, 2021, Smith was accused of not telling the truth about her whereabouts.

38. Smith believes that this incident occurred at the same time that Smith was accused of not being with her preceptor at all times. Ex. A, at 37:11-25, 38:1-20; Ex. G, at ¶¶ 47-53.

39. After Smith told Ms. Wood she could not find Ms. Oliver (her assigned preceptor), Ms. Wood asked Smith where she had been. Ex. A, at 37:11-25, 38:1-20; Ex. G, at ¶¶ 47-53.

40.     After Smith answered her, Ms. Wood said that Smith was lying. Ex. A, at 37:11-25, 38:1-20; Ex. G, at ¶¶ 47-53.

## 6.     Ms. Wood had employees look for Smith.

41.     On one occasion, Smith was doing TMS – online competency training.   Ex. A, at 39:8-10.

42.     She heard that Ms. Wood asked "a couple of employees" to look for her.   Ex. A, at 38:21-25, 39:1-7.[4]

## 7.     Smith was bullied by co-workers.

43.     According to Smith, some of the preceptors "would not let [Smith] write down the information I needed to do my job, let alone give [her] the correct information to do [her] job. Ex. A, at 39:11-25, 40:1-10.

---

[4]     By March of 2021, the KCVAMC was experiencing significant issues with securing Smith's presence at work.   For instance, on March 23, 2021, one of Smith's preceptors sent an email to Ms. Wood noting:

> I worked last week 3/15/21 through 3/19/21 training Tarita [*sic*] and I have real concerns. Monday, Tuesday and Wednesday I overlooked many of her inconsistencies (disappearing, not communicating, extending breaks, unwillingness to learn being rude and only wanting to scribe for the week).   On Thursday I started reporting it. Tarita [*sic*] disappeared and I found out she had went to lunch. I asked the charge nurse Rosemary If she had informed her prior to her leaving for lunch. Rosemary replied "NO" I told Rosemary she didn't inform me either. My concern is that when Tarita [*sic*] is in the procedure room she doesn't participate. I had an EGD case and the patient was combative and she was just standing there. I informed her that if a patient is combative that it's all hands on deck. She spends a lot of time on her cell phone.   Friday was not much different from the rest of the week. For one example, she disappeared without notice, doesn't participate with the procedure.

PALMISANO EMAIL TO WOOD (MARCH 23, 2021) (attached as "Exhibit L").

### 8. Ms. Wood asked Smith if she needed counseling or if she needed to go to Employee Assistance Program Services.

44.     When Smith was hired as an MIT, she told Ms. Wood that she "was coping with a tragedy in [her] family and would need to take time off work to attend court from time to time," specifically, Smith told Ms. Wood that her son had been murdered. Ex. B, at 70:2-12; Ex. G, at ¶ 73.

45.     In response, Ms. Wood asked Smith on different occasions if she needed to utilize the Employee Assistant Program.   Ex. G, at ¶ 74.

46.     According to Smith, "I told her I did not need to seek out the EAP. I had been dealing with [her son's murder] for three years and was already in counseling."   Ex. G, at ¶ 75.

### 9. On April 13, 2021, Ms. Wood said she would not change the morning rotation.

47.     On April 13, 2021, Smith asked Ms. Wood why three senior MITs (who were preceptors) were allowed to start earlier. Ex. G, at ¶ 80.

48.     According to Smith, Ms. Wood responded "That's the schedule." Ex. G, at ¶ 81.

### 10. On April 22, 2021, Smith was questioned as to why she stayed late.

49.     On April 22, 2021, Smith stayed late at work after a procedure was completed because her preceptor do her to do so.   Ex. A, at 48:3-13.

50.     Ms. Wood texted her and asked why she was staying late. Ex. A, at 48:3-13.

51.     Smith told Ms. Wood her preceptor had told her to stay late and Ms. Wood responded "Okay."   Ex. A, at 48:17-24.

## 11. On June 14, 2021, Smith's co-worker was demeaning towards her in a meeting.

52.     According to Smith, on June 14, 2021, one her co-workers – Frank Palmisano – made comments that Smith found demeaning such as "I'm gonna do what I want to do and you guys have to learn from me." and "You're asking too many questions." and "If you don't understand this [how to clean a scope], you don't belong here."   Ex. G, at ¶ 96.

## 12. On August 3, 2021, Ms. Wood told Smith that her leave requests could result in extending her orientation or lead to termination.

53.     In addition to concerns about Smith's scheduled leave, on August 5, 2021, Ms. Wood sent an email to Smith noting that Smith had used nearly 54 hours of unplanned leave:

| | |
|---|---|
| 01/25/2021 | AL 4 hours and LS unplanned 4 hours. |
| 02/05/2021 | AL 0.25 hours, late arrival, 0700-0715 |
| 02/24/2021 | SL unplanned 0.75 hours, late arrival, 0700-0745 |
| 03/02/2021 | SL unplanned 3.5 hours, late arrival, 0700-1030. |
| 03/03/2021 | AL unplanned, 0.5 hours, late arrival, 0700-0730 |
| 03/11/2021 | SL unplanned, 1.5 hours, late arrival, 0700-0830 |
| 03/30/2021 | AL unplanned, 1-hour, late arrival, 0700-0800 |
| 04/05/2021 | SL unplanned, 2 hours, late arrival, 0700-0900 |
| 04/19/2021 | SL unplanned, 2.5 hours, late arrival, 0700-0930 |
| 05/03/2021 | SL unplanned, 1.5 hours, late arrival 0700-0830 |
| 05/10/2021 | SL unplanned 3 hours, left shift early, 1230-1530 |
| 05/21/2021 | SL unplanned 2.5 hours, left shift early, 1300-1530 |
| 06/01/2021 | SL unplanned 1-hour, late arrival, 0700-0800. |
| 06/04/2021 | SL unplanned 0.25 hours, late arrival, 0700-0715 |
| 06/07/2021 | SL unplanned 2.5 hours, left shift early, 1300-1530 |
| 06/08/2021 | SL unplanned 8 hours, call in |
| 06/14/2021 | SL unplanned, late arrival, 0700-0745. |
| 07/02/2021 | SL unplanned, late arrival, 0700-0900 |
| 07/06/2021 | AL unplanned, late arrival, 0700-0715 |
| 07/13/2021 | SL unplanned, 0.75 hours, 0700-0745 |
| 07/21/2021- | SL unplanned, 0.15 hours, 0700-0715 |
| 07/23/2021- | SL unplanned, 1.00 hours, 0700-0800 |
| 08/03/2021 | Called in for 8 hours |
| 08/05/2021 | SL Called in for 2 hours 0700-0900 |

WOOD EMAIL TO SMITH (August 5, 2021) (attached as "Exhibit I").

54.     In her email, Ms. Wood explained to Smith:

> Due to your unplanned leave, it is impacting your orientation and
> may cause an extension of your orientation period. Understand that
> the unplanned time is a pattern and I would like you to monitor as
> future tardiness could result in disciplinary action. Please
> understand that future requests of running late, forgetting PIV
> cards, personal issues, bank/account issues these may be marked as
> AWOL.

Ex. I.

55.     Smith's orientation was not extended and she was not terminated.   Ex. A, at

49:25, 50:1-5.

### 13.     On August 6, 2021, Ms. Wood spoke to her about her leave usage.

56.     Smith now believes this allegation is the same as her August 3, 2021 allegation.

Ex. A, at 50:6-12.

### 14.     On August 10, 2021, Ms. Wood gave her a dirty look.

57.     On August 10, 2021, Ms. Wood gave Smith a dirty look but Smith does not know

why.   Ex. G, at ¶ 116.

58.     Smith did not respond to the dirty look. Ex. G, at ¶ 117.

### 15.     On August 18, 2021, Smith's co-worker would not give her consistent one-on-one training.

59.     According to Smith, on August 18, 2021, her assigned preceptors walked off and

left her without answering her questions.   Ex. G, at ¶ 122.

**16.    On August 20, 2021, Ms. Wood sent Smith an email regarding being late to the morning huddle.**

60.    On August 20, 2021, Ms. Wood sent an email to Smith that sated:

On 08/20/21 huddle started at 0710 and you were not present. Charge nurse discussed staffing for all techs and your name was called without answer. I have previously instructed you to be on duty ready, willing, and able to perform the functions of your position. I have previously stated if you are going to be late, you are to call the call in line to provide leave being utilized. This was not completed 08/20/21.

You were previously advised in person as well as per emails below about tardiness as well as unplanned leave procedure. Due to your late arrival this am, you will be receiving 15 minutes of AWOL. As previously stated, you are required to arrive promptly to work, dressed out and ready for huddle by 0710.

Please let me know if you need anything further.

WOOD EMAIL TO SMITH (AUGUST 20, 2021) (attached as 'Exhibit H").

**17.    On August 20, 2021, Ms. Wood accused Smith of arguing with her.**

61.    In a follow up to the above email, Smith approached Ms. Wood and tried "to provide a fulsome response and explain the situation."   Ex. G, at ¶ 139.

62.    According to Smith, Ms. Wood was not willing to listen.   Ex. G, at ¶ 140.

**18.    On August 25, 2021, Ms. Wood scheduled another meeting with Smith.**

63.    According to Smith, Ms. Wood had a meeting with Smith on August 25 and then she set up a recurring meeting to happen every Friday thereafter.   Ex. G, at ¶ 144.

64.    The recurring meetings were to discuss how the week went and "to find out where [Smith] would be placed the next week so that [Smith and Ms. Wood] would be on the same page week to week.    Ex. G, at ¶ 144.

**19.    On August 26, 2021, Ms. Wood congratulated a
co-worker, but did not congratulate Smith for
the doing the same task.**

65.    On August 26, 2021, Ms. Wood congratulated Ms. Oliver on doing a good job on

a procedure.   Ex. A, at 54:24-25, 55:1-13.

66.    Smith was involved in the same procedure (Ms. Oliver was Smith's preceptor on

that day) but Ms. Wood sad nothing to her.   Ex. A, at 54:24-25, 55:1-13.

**20.    On August 31, 2021, a co-worker argued with
Smith.**

67.    On August 31, 2021, Smith and another MIT were practicing with a stent that was

due to expire on September 2.   Ex. G, at ¶ 158.

68.    Smith and the other MIT reasoned that the KCVAMC did not use the particular

stent very often so it was unlikely to be needed before it expired. Ex. G, at ¶ 158.

69.    Ms. Oliver told the MITs that they should not be practicing with a stent that was

not yet expired. Ex. G, at ¶ 158.

**21.    On September 16, 2021, Smith was forced to use
sick leave to get her Covid-19 shot.**

70.    Smith was originally told that she would need to use sick leave to get her COVID-

19 vaccination. Ex. A, at 57:22-25, 58:1-25.

71.    Subsequently, the Assistant Nurse Manager, Mr. Scholl, told Smith that she

would not need to use sick leave. Ex. A, at 57:22-25, 58:1-25.

72.    Mr. Scholl showed Smith how to make the change and her sick leave was

restored.   Ex. A, at 57:22-25, 58:1-25.

### 22. On September 19, 2021, a co-worker called Smith out in the morning huddle.

73. When MITs completed scopes, they were supposed to use a black marker to indicate that the scope was clean. Ex. A, at 56:11-25, 57:1-2.

74. On September 19, 2021, Mr. Palmisano criticized Smith during a morning huddle because she had used a red marker. Ex. A, at 56:11-25, 57:1-2.

### 23. On October 11, 2021, Smith lost her Leave Without Pay time.

75. In October of 2021, Smith was exposed to Covid-19 and told to stay home until symptoms subsided. Ex. G, at ¶ 193.

76. According to Smith, she "discovered [she] lost [her] LWOP when [she] returned to work on October 11, 2021. Ex. G, at ¶ 194.

77. According Smith, Ms. Wood had designated Smith's leave as LWOP rather than put[ting] the leave time together from sick leave." Ex. G, at ¶ 194.

78. Because Smith had exhausted her sick leave, she had to be shown as either LWOP or AWOL. Ex. B, at 72:22-25, 73:1-16.[5]

---

[5] In fact, by December 3, 2021, the Assistant Nurse Manager had to issue a Memorandum to Smith requiring her to obtain certification before requesting further leave because:

> [S]ince August 1, 2021, [Smith] earned thirty-six (36) hours of sick leave [but] used forty-three and three quarters (43.75) hours of sick leave. [In addition, Smith] ha[d] been issued twenty-nine (29) hours of Leave Without Pay (LWOP) when [she] did not have sick leave available. [Smith was] also issued eight and one quarter (8.25) hours of AWOL when [she] did not have sick leave available.

MEMORANDUM TO SMITH (December 3, 2021) (attached as "Exhibit J").

**24. On October 15 and 18, 2021, Ms. Wood told Smith she had not received Smith's self-assessment.**

79. MITs at the KCVAMC were required to perform a self-assessment as part of their performance evaluation. Ex. A, at 57:3-21.

80. On October 15 and 18, 2021, Ms. Wood told Smith she had not received Smith's self-assessment. Ex. A, at 57:3-21.

81. In fact, Smith had already turned in her self-assessment to the Assistant Nurse Manager, Mr. Scholl. Ex. A, at 57:3-21.

## C. Smith's resignation

82. According to Smith, Ms. Wood had told Smith that the VA wanted to retain Smith after the completion of her probationary period and that, after Smith completed her one-year probationary period, Ms. Wood would approve Smith's transfer to a different department at the KCVAMC if she wished. Ex. A, at 61:3-16.

83. On January 7, 2022, Smith submitted an email to the KCVAMC stating that she was giving her two-weeks' notice and would be resigning effective January 22, 2022. Ex. A, at 60:3-9; SMITH EMAIL TO WOOD (January 7, 2022) (attached as "Exhibit K").

84. As noted by Smith, her resignation was effective three days after she completed her one-year probationary period. Ex. K.

85. Prior to resigning, Smith did not tell either Ms. Wood or Ms. Scholl ahead of time that she was resigning. Ex. A, at 62:21-25, 63:1-9.

## II.      Decisional standards under FED. R. CIV. P. 56

The Federal Rules of Civil Procedure provide that summary judgment – even in cases asserting claims of employment discrimination – is to be rendered on any "claim or defense" if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  As with many motions to dismiss, a court ruling on a Rule 56 motion is required to view the facts in the light most favorable to the party opposing summary judgment.  *Dunn v. Does 1-22*, 116 F.4th 737, 745 (8th Cir. 2024).  However, such a rule "does not mean [a court is] bound to credit the [non-moving party's] version of events, come what may." *Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018).  Instead, a party opposing summary judgment must "set forth specific facts in the record showing that there is a genuine issue for trial." *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032 (8th Cir. 2016).  And while a party may oppose summary judgment by establishing genuine factual disagreements, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

## III.      Summary judgment in favor of the VA on Smith's claims of retaliation and constructive discharge is required because Smith did not exhaust administrative remedies

With her COMPLAINT, Smith purports to bring employment discrimination claims against the VA pursuant to both Title VII and the ADEA.  Specifically, Smith's COMPLAINT sets forth seven counts, to wit:

(a)      Disparate treatment based on race discrimination [Count I],

(b)      Hostile work environment based on race and color [Count II],

(c)      Retaliation under Title VII [Count III],

(d)     Disparate treatment based on age discrimination [Count IV],

(e)     Hostile work environment based on age [Count V],

(f)     Retaliation under the ADEA [Count VI], and

(g)     Constructive discharge [Count VII].

However, as set out herein, neither Smith's claims for retaliation [Counts III and VI] nor her claim for a constructive discharge [Count VII] were administratively exhausted as required before seeking judicial review.

## 1.  Retaliation

Unquestionably, to pursue retaliation claims in federal court, a federal employee must have first exhausted all available administrative remedies. *Watson v. O'Neill*, 365 F.3d 609, 614 (8th Cir. 2004) ("Plaintiffs in [Title VII] employment discrimination cases against government agencies must exhaust their administrative remedies prior to filing a civil action in federal district court."). This exhaustion requirement for federal employees extends as well to claims under the ADEA.  *Snyder v. Glickman*, 3 Fed. Appx. 568, 569 (8th Cir. 2001).

Federal regulations explicitly delineate the requirements for exhausting administrative remedies for federal employment discrimination litigation. 29 C.F.R. §§ 1614.104-1614.110. The exhaustion requirement entails both an "informal" and a "formal" stage of administrative consideration.  The regulations require an aggrieved claimant initially to contact a counselor employed by the government agency within 45 days of alleged discriminatory actions to attempt informal resolution. 29 C.F.R § 1614.105(a)(1). If the claimant does not resolve the complaint through informal counseling and wishes to further pursue the matter, the claimant must file a formal complaint of discrimination within a 15 days of receiving written notice from the counselor of the claimant's right to file such a formal complaint.  29 C.F.R § 1614.106(b).

As set forth in more detail in the factual discussion *supra*, in this case, Smith initiated informal EEO counseling on August 11, 2021.  In making this initial complaint to the VA, Smith alleged that she had been subject to discrimination based on race and age. Subsequently, when Smith and the VA were unable to resolve Smith's complaints informally, Smith filed a formal administrative COMPLAINT OF EMPLOYMENT DISCRIMINATION on October 26, 2021, repeating her allegations that she had been subject to race and age discrimination. More specifically, in her formal administrative COMPLAINT OF EMPLOYMENT DISCRIMINATION, Smith was required:

> For each employment related matter that you believe was discriminatory, you must list the bases (list one or more of the following):  Race (Specify), Color (Specify), Sex (male or Female), National Origin (Specify), Age (Provide date of birth), Disability (Specify), Genetic Information, and Reprisal for prior EEO activity or having opposed discrimination.

Ex. E.  Following those directions, Smith wrote in her administrative complaint that the only bases for her claims was "Age (over 40)" and "Race (Blk)."  Ex. E.  The formal complaint does not assert a claim for retaliation. Ex. E.

Following the filing of her administrative complaint, the VA notified Smith that it had received and reviewed Smith's written complaint and had identified as the issues:

> Whether [Smith] is subjected to a hostile work environment based on Age and Race (Black) when [setting out 24 incidents/actions identified by Smith].[6]

Ex. F.  The VA's issue notification letter further informed Smith that:

---

[6]     The VA's Notice of Acceptance letter also identified two discrete employment actions of alleged race and discrimination, to wit:

(1)     On September 16, 2021, [Smith] was forced to use sick leave to get her Covid-19 shot.

(2)     On October 11, 2021, [Smith] lost her Leave Without Pay time.

Ex. F.

> If you believe that the accepted claims are formulated improperly,
> incomplete, or incorrect, you must notify this office within seven (7)
> calendar days of receipt of this letter, in writing, by email, or fax,
> stating your disagreement. . . .  If you do not contact this office within
> 7 calendar days, we will assume that we correctly stated the claims.

Ex. F.  During the ensuing administrative investigation into her claims, Smith never challenged the determination that her issues were limited to only claims of race and age discrimination. Based on the forgoing, the VA does not dispute that Smith exhausted her claims of race and age discrimination.  However, for the reason set out below, the VA asserts Smith's claim of retaliation was not administratively exhausted.

As noted, plaintiffs in discrimination cases against federal government agencies must exhaust their administrative remedies prior to filing a civil action in federal district court.  *Brown v. Gen. Serv's. Admin*., 425 U.S. 820, 832, 96 S.Ct. 1961, 1967 (1976). Specifically, Smith "was required to seek timely and appropriate relief from the EEO department of the [VA], thereby providing the [VA] with notice of the charges and an opportunity to comply voluntarily with applicable statutes."  *Watson*, 365 F.3d at 614.

In *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218 (8th Cir. 1994), the Eighth Circuit extensively considered the requirements for administrative exhaustion:

> Allowing a complaint to encompass allegations outside the ambit of
> the predicate EEOC charge would circumscribe the EEOC's
> investigatory and conciliatory role, as well as deprive the charged
> party with proper notice of the charge, as surely as would an initial
> failure to file a timely EEOC charge.

*Id*. at 223.  In *Williams*, the court found that a plaintiff's claim of race discrimination must be dismissed as unexhausted because her administrative complaint "failed to allege any facts in the narrative section of her charge which raise the issue of race discrimination" and the charge "[did] not even hint of a claim of race discrimination."  *Williams*, 21 F.3d at 222-23.

Following *Williams*, over the last 30 years, in construing the exhaustion requirement

under the federal employment discrimination laws, the Eighth Circuit has consistently found that

claimed bases of discrimination were not exhausted where a plaintiff did not raise the

discriminatory bases in his or her administrative complaint of discrimination.  *See*, *e.g.*, *Slayden*

*v. Ctr. for Behav. Med.*, 53 F.4th 464, 469 (8th Cir. 2022).  In one case, the court held:

> [Plaintiff's retaliation] claim . . . remains unexhausted, no matter what
> the standard. Even with all inferences drawn in favor of [plaintiff], her
> [administrative claim] mentions only discrimination on the basis of race
> and sex . . . .  Since [plaintiff's administrative] charge does not allege
> any . . . retaliation and [it is] unrelated to race and sex discrimination,
> [retaliation is] unexhausted and [was] properly dismissed.

*Brooks v. Midwest Heart Grp.*, 655 F.3d 796, 801 (8th Cir. 2011).  The *Brooks* decision is

controlling and requires dismissal of Smith' unexhausted claim of retaliation.

In an effort to avoid the supposed harshness of the exhaustion, the Eighth Circuit

developed a "judicial exception to the exhaustion doctrine."  *Wedow v. City of Kansas City, Mo.*,

442 F.3d 661, 672-73 (8th Cir. 2006).  In its earliest incarnation, the exception provided:

> When suit may be brought on an administrative charge challenging
> related employer actions, the purposes of the statutory exhaustion
> requirement are not furthered through additional administrative filings
> because "once the [agency] has tried to achieve a consensual resolution
> of the complaint, and the discrimination continues, there is minimal
> likelihood that further conciliation will succeed."  A plaintiff will be
> deemed to have exhausted administrative remedies if the allegations of
> the judicial complaint are like or reasonably related to the
> administrative charges that were timely brought.

*Anderson v. Block*, 807 F.2d 145, 148 (8th Cir. 1986).  However, following the decision of the

United States Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122

S.Ct. 2061, 2072 (2002) (discussed infra), the Eighth Circuit "considerably narrowed" its

application of the judicial exception. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 852 (8th

Cir. 2012).  As articulated in a series of court decisions, in general, in this Circuit:

> The exhaustion requirement may be satisfied if the civil claim grows
> out of or is like or reasonably related to the substance of the allegations
> in the administrative charge, but the civil suit can be only as broad as
> the scope of any investigation that reasonably could have been
> expected to result from the initial charge of discrimination.

*Slayden*, 53 F.4th at 468. Under this formulation, courts consistently and repeatedly have found that when an administrative complaint alleges different bases for discrimination but does not list retaliation as a separate actionable "basis," the retaliation claim has not been exhausted.

> While at one time, . . . the exhaustion doctrine permitted a finding that
> a subsequent retaliation claim growing out of an EEOC age
> discrimination complaint was sufficiently related to be within the scope
> of the lawsuit, we have subsequently recognized that "retaliation claims
> are not reasonably related to underlying discrimination claims."

*Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 852 (8th Cir. 2012) (*quoting Wedow v. City of Kansas City*, 442 F.3d 661, 672-73 (8th Cir. 2006)). *See also Slayden*, 53 F.4th at 468 ("[I]t is well established that retaliation claims are not reasonably related to underlying discrimination claims."); *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944-45 (8th Cir. 2021).[7] Smith's failure to raise retaliation in her administrative charge dooms such claims before this Court.

## 2. Constructive discharge

On January 21, 2022, Smith unilaterally resigned from her job with the VA. However, Smith never sought to add her resignation as an issue in her administrative complaint of discrimination. Nonetheless, in Count VII of her COMPLAINT, Smith included a claim seeking damages for constructive discharge. As set out herein, Smith did not exhaust her administrative remedies with resect to any constructive discharge.

---

[7] Smith's COMPLAINT includes a claim of color discrimination that was not included in the administrative complaint. However, unlike retaliation, color discrimination claims have been found to be reasonably related to race discrimination claims. *See, e.g., El-Scari v. Comprehensive Mental Health Servs.*, 2019 WL 5386489, op. at *5 (W.D. Mo. Oct. 21, 2019).

Employees are constructively discharged when their employers deliberately render the employees' working conditions intolerable and thus force the employees to quit their jobs. *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021). To establish an actionable case of constructive discharge, an aggrieved plaintiff "shoulders a substantial burden." *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017). *See also O'Brien v. Dept. of Agriculture*, 532 F.3d 805, 810-11 (8th Cir. 2008) ("[T]he bar is quite high in [constructive discharge] cases [in that] conditions must be sufficiently extraordinary and egregious.").

> A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign.

*Green v. Brennan*, 578 U.S. 547, 555, 136 S.Ct. 1769, 1777 (2016). In addition, a plaintiff must also show that she afforded her employer a reasonable opportunity to correct the intolerable condition before she terminated her employment. *Cosby v. Steak N Shake*, 804 F.3d 1242, 1246 (8th Cir. 2015).[8] However, if an "employee resigns in the face of such [intolerable] circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Green*, 578 U.S. at 555, 136 S.Ct. at 1776-77.

As explained by the Eighth Circuit, "[a] constructive discharge is a discrete act of discrimination or retaliation." *Henson v. Union Pac. R.R. Co.*, 3 F.4th at 1081. Relatedly, the Supreme Court has held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 2072 (2002). *Morgan* provides the starting point for determining whether a constructive discharge claim has been exhausted.

---

[8]     An employee has an "obligation not to assume the worst, and not to jump to conclusions too fast." *Alvarez v. Des Moines Bolt Supply*, 626 F.3d 410, 419 (8th Cir. 2010).

In analyzing whether an employee has timely pursued an employment discrimination claim, the Supreme Court has emphasized that separate analyses must be utilized depending on the type of claim being asserted. *Morgan*, 536 U.S. at 114-15, 122 S.Ct. at 2073. According to the Court, "discrete acts" (such as terminations, demotions, suspensions, denied promotions, or failures to hire) are separate, unlawful employment practices and must be individually timely raised with an EEO counselor, *i.e.*, within 45 days of when the discriminatory action "occurred." *Id*. at 114, 122 S.Ct. at 2073. To that end, the Court further explained that a "discrete discriminatory act 'occurred' on the day that it 'happened.'" Id. at 110, 122 S.Ct. at 2070. Thus, a constructive discharge claim accrues on the day an employee informs an employer that he or she is resigning. *Green*. 578 U.S. at 547, 136 S.Ct. at 1782.

In this case, Smith gave notice of her resignation in 2022 and did not seek informal counseling or file any administrative complaint of discrimination thereafter. As a consequence, the only avenue available for Smith to satisfy the exhaustion requirement is for her constructive discharge claim to fall within the ambit of the Eighth Circuit's aforementioned "judicial exception to the exhaustion doctrine" that grow out of or are like or reasonably related to the substance of the allegations in the administrative charge.

However, in its decision in *Henson v. Union Pac. R.R. Co.*, the Eighth Circuit concluded that constructive discharge claims are not reasonably related to discrimination and retaliation claims in an exhausted administrative complaint where the plaintiff "did not assert in [her] charge that [she] had been or was about to be constructively discharged." *Henson*, 3 F.4th at 1081. Moreover, the Court noted that it was not reasonable to treat a constructive discharge claim as reasonably related to exhausted discrimination and retaliation claims where months passed between a plaintiff after the charges were initiated and the plaintiff's resignation. Id.

(resignation did not occur until nine moths after charge was filed). *See also Slayden v. Ctr. for Behav. Med.*, 53 F.4th 464, 469 (8th Cir. 2022) (no exhaustion where "[the plaintiff's] charge gave no indication that he was about to be constructively discharged, and [the plaintiff] did not resign from [the employer] until approximately five months after he filed his charge."); *Sherman v. McDonough*, 2024 WL 1748023, op. at *6 (W.D. Mo. Apr. 23, 2024) ("since [the plaintiff] had not quit or indicated that she intended to quit at the time she filed these EEO complaints, it would be difficult, if not impossible, to construe her administrative claims as encompassing constructive discharge").

In this case, akin to *Henson*, *Slayden*, and *Sherman*, Smith's EEO claims do not indicate that she was being constructive discharged or that she was contemplating quitting. Indeed, Smith did not resign until five months after she initiated her EEO case. Moreover, Smith never sought to amend her EEO case is include a claim of constructive discharge or otherwise address her resignation. Under Eighth Circuit law, Smith's claim of constructive discharge was not exhausted and the Court must enter summary judgment in favor of the VA on Count VII of the Complaint.

## IV. Summary judgment in favor of the VA on Smith's claims of discrete employment actions based on race, color, and age discrimination is required because Smith's claims do not survive scrutiny under *McDonnell Douglas*.

During its administrative investigation into Smith's complaint, the VA identified two potential discrete employment actions:

(1)     On September 16, 2021, Smith was forced to use sick leave to get her Covid-19 shot, and

(2)     On October 11, 2021, Smith lost her Leave without Pay time.

With regard to these discrete claims, because Smith does not allege that she has any direct evidence[9] of race or age discrimination by the VA with regard to these actions – the efficacy of Smith's discrete employment claims is subject to the familiar burden-shifting analysis articulated by the Supreme Court in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817 (1973).

Applying the *McDonnell Douglas* test, Smith bears the initial burden of establishing a *prima facie* case of race and age discrimination. *Heisler v. Nationwide Mutual Insurance Co.,* 931 F.3d 786, 794 (8th Cir. 2019). If (and only if) Smith establishes such *prima facie* cases, then the burden shifts to the VA to articulate legitimate reasons for the supposed adverse actions. *Id*. However, once the VA articulates such reasons, the burden of production shifts back to Smith to show that the VA's stated reasons are "merely a pretext for discrimination or retaliation." *Id*. Further, notwithstanding this shifting of the burden of production, Smith, as the plaintiff, "at all times bears the ultimate burden of persuasion." *Id*. (*quoting*, *in part*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2761(1993)).

The *prima facie* cases for race discrimination under Title VII and age discrimination under the ADEA are well-settled and essentially identical. To shift the burden to the VA under *McDonnell Douglas*, Smith must establish:

(1)     she is a member of a protected group (*i.e.*, African American and over the age of 40),

(2)     she was meeting the legitimate expectations of her job duties,

(3)     she suffered an adverse employment action, and

(4)     a causal connection between her membership in the protected group and the adverse action.

---

[9]     "Direct evidence most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *Perry v. Zoetis, LLC*, 8 F.4th 677, 682 (8th Cir. 2021).

*Hester v. Dept. of Treasury*, — F.4th —, —, 2025 WL 1352400, op. at *2 (8th Cir. May 9, 2025); *Carter v. Atrium Hosp.*, 997 F.3d 803, 809 (8th Cir. 2021); *Faulkner v. Douglas County Nebraska*, 906 F.3d 728, 732 (8th Cir. 2018).  The VA does not believe that Smith can establish a *prima facie* case of discrimination as to either act.[10] But even if Smith can satisfy her *prima facie* tests for race and age discrimination, the VA easily satisfies the minimal requirements for articulating a legitimate nondiscriminatory reason for its disputed discrete decisions and, as such, the burden shifts back to Smith to establish a trialworthy issue of pretext in order to avoid entry of summary judgment.

The Eighth Circuit has explained what a plaintiff must do to show that proffered justifications are mere pretext to hide illegal discrimination and retaliation:

> To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason . . . .  [T]he plaintiff must do more than simply create a factual dispute as to the issue of pretext; [she] must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010).  More specifically, a plaintiff "must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations." *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008). Thus, "[t]o prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, rather [the employee] must show that the employer has offered a 'phony excuse.'" *Id.*

---

[10]    Specifically, the VA asserts that Smith cannot show that either allegation constitutes an adverse employment action under the newly articulated standard announced by the Supreme Court in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 144 S.Ct. 967 (2024) which requires a plaintiff to establish "some harm" from the subject employment action.  *Id*. at 350, 144 S.Ct. at 972.

> A proffered legitimate, non-discriminatory reason for [an adverse employment action] need not, in the end, be correct[11] if the employer honestly believed the asserted grounds at the time of the [action].

*Id*.  A court may properly grant summary judgment if a plaintiff fails to show that there is a genuine issue of material fact as to whether the employer's proffered justification was a pretext for an illegal discriminatory.  *Id*.

In this case, Smith has not and cannot come forward with any "significant probative evidence" indicating that the reasons put forward by the VA were mere cover to hide illegal discrimination. *Cf. Buettner v. Arch Coal Sales, Inc.*, 216 F.3d 707, 718 (8th Cir. 2000) ("A plaintiff [in an employment discrimination case] facing a summary judgment motion cannot get to a jury without any significant probative evidence tending to support the complaint.").  Smith may subjectively "feel" or "believe" that the actions of the VA were illegal discrimination. However, with regard to such personal feelings, no matter how subjectively honest, they plainly cannot establish a case of pretext.  *Cf. Davis v. McDonough*, 2023 WL 7298591, at *4 (W.D. Mo. Nov. 1, 2023) ("the case law holds arguments based on subjective feelings of unfairness and discrimination – like those the plaintiff makes here – are not a basis for finding pretext").

In the absence of a trialworthy issue of pretext, summary judgment must be granted in favor of the VA on any and all of Smith's claims of discrete acts of discrimination.

---

[11]     Moreover, with regard to the VA's actions, "employers have wide latitude to make business decisions." *LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 692 (8th Cir. 2001). Thus, the Eighth Circuit has reiterated:

> The discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination or retaliation.

*Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 976 (8th Cir. 2012).

**V.    Summary judgment in favor of the VA on Smith's claims of a hostile work environment based on race and age is required because Smith cannot establish an actionable hostile work environment under Eighth Circuit law**

As raised in the administrative complaint, subsequently investigated by the VA, and finally plead in Counts II and IV of Smith's COMPLAINT, Smith seeks to establish a hostile work environment based on an array of incidents.  Summary judgment on both counts must be entered for the VA.

Regardless of the underlying basis for the harassment claims (race or age), in order to establish an actionable claim of a hostile work environment, Smith must show that: (1) she was a member of a protected class, (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions, or privileges of Smith's employment.  *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019).[12]   For purposes of this motion, the VA will focus on the third and fourth elements of the *prima facie* case – *i.e.*, whether the alleged harassment resulted from Smith's race or age and whether the conduct complained of by Smith was sufficiently severe.

The law is well-settled that "[h]ostile work environment claims are limited in nature." *Anda v. Wickes Furn. Co.*, 517 F.3d 526, 531 (8th Cir. 2008).  And, in this case, there simply is no evidence to suggest that any of the actions undertaken or conduct identified by Smith during her brief tenure with the VA have any causal connection to either her race or her age beyond Smith's assumptions and subjective beliefs.

---

[12]       *Mahler* involved a claim of a hostile work environment under Title VII. However, the same *prima facie* showing for a hostile work environment is required under the ADEA.  *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922 (8th Cir. 2023).

With regard to the required severity and pervasiveness of alleged harassment, the standard is both well-settled and daunting:

> Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 823 (8th Cir. 2017) (*emphasis added*).  Courts must analyze the "offending" conduct under both a subjective and an objective test.  *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016).  In this case, even accepting that Smith subjectively viewed the VA's conduct and workplace as hostile and abusive, applying the Eighth Circuit's precedent, the Court must find found that Smith has failed to establish that the conduct of the VA was "sufficiently severe or pervasive [so as] to create an environment that a reasonable person would find hostile or abusive and that actually altered the conditions of [Smith's] employment." *Hales v. Casey's Marketing Co.*, 886 F.3d 730 735 (8th Cir. 2018).

As detailed in the factual discussion, *supra*, Smith alleges a hostile work environment based on 24 largely trivial workplace events.  Even if Smith can show that these actions were all chargeable to VA management (as opposed to co-workers) and were undertaken by the VA based on Smith's race or age, the sporadic incidents alleged by Smith fall significantly short of demonstrating an objective hostile work environment. *Cf. Jackman v. Fifth Jud. Dist. Dept. of Corr. Servs*, 728 F.3d 800, 806 (8th Cir. 2013) ("The standard for demonstrating a hostile work environment under Title VII is demanding and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace."); *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007) ("Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment.").

The Supreme Court has repeatedly "cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment." *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). Indeed:

> The stringent hostile work environment standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing."

*Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083 (8th Cir. 2010) (*quoting*, *in part*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283 (1998)). Ultimately, "merely rude or unpleasant" conduct is insufficient "to affect the terms and conditions of employment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010).

In this case, at best, Smith's evidence establishes a workplace where Smith did not get along with the VA Nurse Manager and some of her co-workers. The federal employment discrimination laws are intended to root extreme harassing conduct that saturates and pervades the workplace, they do not – and cannot – regulate or control the civility (or lack thereof) between supervisors and employees or among co-workers in the workplace. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006) ("courts have held that personality conflicts at work that generate antipathy 'snubbing' by supervisors and co-workers" are not covered by Title VII); *Sutherland v. Missouri Dept. of Corr.*, 580 F.3d 748, 752(8th Cir. 2009) ("Petty slights and minor annoyances in the workplace, as well as personality conflicts and snubs by co-workers, are not actionable."); *Burgett v. Kijakazi*, 2022 WL 4468622, op. at *8 (W.D. Mo. Sept. 26, 2022), *aff'd*, 2023 WL 4881472 (8th Cir. Aug. 1, 2023) (no hostile work environment where evidence merely "establishes a workplace personality conflict between Plaintiff and his" supervisors).

In this case, even if some of the complained-of conduct can certainly be characterized "rude or unpleasant," under the established law it simply was "not severe enough to affect the terms, conditions, or privileges of [Smith's] employment." *Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015).[13]

## VI. Conclusion

For the foregoing reasons, defendant Douglas A. Collins, in his official capacity as the Secretary of Veterans Affairs, respectfully requests that the Court enter an order of summary judgment in favor of the VA and against plaintiff Territa Smith on all issues raised in in the COMPLAINT.

---

[13]     The insufficiency of Smith's hostile work environment claim also resolves Smith's constructive discharge claim even if that claim was not otherwise barred by a failure to exhaust administrative remedies. Often plaintiffs asserting constructive discharge claims rely on the identical actions alleged to constitute a hostile work environment. Such is the case with Smith. Such "dual" claims are referred to as "compound claims" and as articulated by the Supreme Court:

> [A] constructive discharge . . . can be regarded as an aggravated case of sexual harassment or hostile work environment. . . . A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47, 124 S.Ct. 2342, 2354 (2004). When a plaintiff relies on the same evidence to support both hostile work environment and constructive discharge claims, the Eighth Circuit has noted a finding that the plaintiff's allegations were "insufficient to establish a hostile work environment" also necessarily means that "her [constructive discharge] claim fails." *Wilkie v. Dept. of Health & Human Servs.*, 638 F.3d 944, 954 (8th Cir. 2011). *See also Parker v. United States Dept. of Agric.*, 129 F.4th 1104, 1114 (8th Cir. 2025) ("Because a 'hostile-environment constructive discharge claim entails something more' than an actionable hostile work environment and [plaintiff] has not met even this lower burden, the district court did not err in granting summary judgment on the constructive discharge claim.").

Respectfully submitted,

Teresa A. Moore
United States Attorney

By     */s/ Jeffrey P. Ray*

Jeffrey P. Ray
Deputy United States Attorney
Missouri Bar No. 35632

Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, MO 64106
(816) 426-3130   FAX: (816) 426-3165
E-MAIL: Jeffrey.Ray@usdoj.gov

ATTORNEYS FOR DEFENDANT DOUGLAS A.
COLLINS, in his official capacity as the Secretary
of Veterans Affairs