# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| TERRITA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-CV-00025-DGK |
| | ) | |
| DOUGLAS COLLINS, SECRETARY, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an employment discrimination case. Plaintiff Territa Smith alleges claims for discrimination, hostile work environment, retaliation, and constructive discharge against Defendant Secretary of the Department of Veterans Affairs for alleged actions at the Kansas City Veterans Affairs Medical Center (the "KCVAMC") in Kansas City, Missouri.

Now before the Court is Defendant's motion for summary judgment on all claims. ECF No. 22. Finding that there are no genuine issues as to any material fact and that Defendant is entitled to judgment as a matter of law, the Court GRANTS the motion.

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). But the nonmoving party "cannot simply rest on the allegations in [his] complaint." *Sherman v. Collins*, 158 F.4th 904, 907 (8th Cir. 2025). "Instead, he must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Grant v. City of Blytheville, Arkansas*, 841 F.3d 767, 770 (8th Cir. 2016) (alterations in original) (citations omitted).

### Undisputed Material Facts

Before summarizing the undisputed material facts, the Court must note a significant deficiency in Plaintiff's summary judgment briefing that shapes what facts are included below.

Local Rule 56.1(b)(1) requires that "[a] party opposing a motion for summary judgment must begin its opposing suggestions by admitting or controverting each separately numbered paragraph in the movant's statement of facts." When controverting a fact, Local Rule 56.1(b)(1) requires the opposing party to "properly support its denial in accordance with Fed. R. Civ. P. 56(c)." Likewise, if an opposing party provides additional facts, Local Rule 56.1(b)(2) requires "[e]ach fact in dispute be set forth in a separately numbered paragraph and supported in accordance with Fed. R. Civ. P. 56(c)." Federal Rule of Civil Procedure 56(c)(1)(A) in turn requires "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . ." In other words, each sentence that sets forth a fact must be in a separately numbered paragraph and must contain the record citations that support that fact and paragraph.

2

While all these requirements are important and must be followed, the separately numbered paragraph issue is of paramount importance. The reason for this requirement is so the Court can easily refer to which precise facts or parts of a fact are being disputed and whether they are supported by the record. When several facts and sentences are listed in a single paragraph, Defendant and the Court must laboriously sift through various record cites and sentences to determine what is truly disputed and supported. It makes it even more complicated when all the record cites are at the end of the last sentence in a multi-sentence paragraph. Violations of this nature waste the Court's and Defendant's time and resources.

As Defendant aptly notes in his reply brief in support of summary judgment, ECF No. 30 at 2–3, Plaintiff's summary judgment briefing violates these rules. Her summary judgment briefing does not begin with admitting or controverting each fact; instead, she provides essentially an eight-page "introduction" that acts as an extended narrative and argument section that supports her case. *See* ECF No. 28 at 1–9. Only after doing this does she address Defendant's facts. This violates the requirements of Local Rule 56.1(b)(1). Plaintiff then filed a separate nine-page legal brief that argues her claims, albeit in a perfunctory manner. *See* ECF No. 29. When her improper introduction—which cites law and makes arguments—is combined with her separate legal brief, the two exceed the fifteen-page limit set under Local Rule 7.0(d)(1)(B) for opposition briefs. So her introduction also leads to this separate violation of the Local Rules.

But the most troubling violation is that approximately half of Plaintiff's statement of additional facts violates the requirement that each fact must be in a separately numbered and supported paragraph. For example, many of Plaintiff's statements of fact contain multiple sentences in a numbered paragraph, with some only containing a single citation at the end of multiple sentences. *See* ECF No. 28 at ¶¶ 3–7, 9–11, 16, 19, 21–23, 25–26, 28, 30, 32, 36, 38,

3

41, 43, 45. Worse yet, she has several separately numbered paragraphs that contain between two to fifteen separately lettered subparagraphs, with many of the subparagraphs also containing multiple sentences. *See id.* at ¶¶ 20, 24, 40.

This is not an isolated incident, however. Plaintiff's counsel has violated this rule in other cases. *See Sly v. McDonough*, No. 4:24-cv-00448, ECF No. 25 (W.D. Mo. Oct. 7, 2025); *Williams v. McDonough*, No. 4:21-cv-00781-DGK, ECF No. 39 at 3 (W.D. Mo. Dec. 1, 2025) (noting a similar violation of the Local Rules). In *Sly*, even after the Court struck her initial statement of facts and gave her a chance to refile them, many of her refiled facts still violated the Local Rules and were struck again. *See Sly*, No. 4:24-cv-00448, ECF No. 31.

The Court finds striking facts, but then allowing re-briefing, would be a waste of time and resources. Unlike in *Sly*, Defendant has already responded to her statement of facts here so requiring him to do it again after re-briefing would burden him. Moreover, it would further delay this already old case. And there is no guarantee her re-briefing would cure the issue since she violated the rule again during re-briefing in *Sly*. Similarly, in this case, she previously had a motion denied for violating the Local Rules, ECF No. 24, but she persisted in violating the Local Rules again despite that warning. The best course of action here for violating the Local Rules yet again is for the Court to ignore all the paragraphs cited above and her introduction (ECF No. 28 at 1–9). If the Court were to wade through these improperly stated facts, it would waste significant time and resources. Thus, the Court declines to do so.

Aside from these ignored facts, the Court has used the tools it always does to determine the undisputed facts. First, the Court has limited the facts to those that are undisputed and material to the pending summary judgment motion. *See* Fed. R. Civ. P. 56; L.R. 56.1. Second, the Court has excluded legal conclusions, argument presented as fact, proposed facts which are duplicative

of other proposed facts, and proposed facts which are not admitted and not properly supported by the record or admissible evidence.  *See* Fed. R. Civ. P. 56; L.R. 56.1.  On this latter issue specifically, Plaintiff cites to record evidence generally without specific pinpoint cites or her pinpoint cites were incorrect.  Defendant rightfully objects to these issues, and since it is not the Court or Defendant's job to hunt through the record for the evidence supporting her position, the Court excludes those facts as unsupported.  *See ASARCO, LLC v. Union Pac. R.R. Co.*, 762 F.3d 744, 754 (8th Cir. 2014) ("Asarco should not be surprised neither the district court nor UP searched the record to uncover vague extra-contractual allegations.  Judges are not like pigs, hunting for truffles buried in briefs or the record." (quotation marks omitted)).  Finally, the Court has included proposed material facts which have been improperly controverted.  *See* Fed. R. Civ. P. 56; L.R. 56.1.[1]

With these issues out of the way, the undisputed facts are as follows.  Plaintiff is an African-American woman over the age of forty.  Around 2003, Plaintiff graduated from Concorde Career College with certificates in Phlebotomy and as a Medical Assistant.  Prior to working at the KCVAMC, Plaintiff was a Medical Assistant Instructor at Concorde, Well Springs, and Heritage Colleges.

In January 2021, Jeanine Wood, who was a Nurse Manager at the KCVAMC, hired Plaintiff as a Medical Instrument Technician ("MIT") in the Gastroenterology Unit (the "GI Unit").  Plaintiff was hired for this role pursuant to a one-year probationary period.  During the relevant time, Ms. Wood was Plaintiff's supervisor in the GI Unit.  Ms. Wood also had an Assistant Nurse Manager, Justin Scholl.

---

[1] Although the Court does not include many of Plaintiff's facts for all these reasons, many—if not most—of Plaintiff's facts were properly stated and supported in Defendant's motion for summary judgment, so they are still stated here because of that.

5

Around the time she was hired, Plaintiff told Ms. Wood that her son had been murdered two weeks before his high school graduation, and she would need to miss work for court dates and associated matters. Plaintiff told Ms. Wood that she would likely miss the most work during March and April 2021. According to Plaintiff, Ms. Wood promised to work with Plaintiff while those issues were ongoing.

After being hired, Plaintiff started her training in the GI Unit as an MIT. Among other things, an MIT operates and monitors commonly used medical equipment, assists with scheduling and coordinating special procedures, prepares patients, maintains bio-medical equipment, and maintains inventory supplies. When not assisting with procedures, MITs are expected to answer phones, assist in the recovery/pre-operative area, answer patient questions, restock inventory, and perform general administrative functions.

To learn this job, MITs are assigned to preceptors. The MITs are supposed to always shadow the preceptors. A preceptor is essentially an experienced MIT who is supposed to have knowledge of how the equipment works and the procedures are done. During her time at the KCVAMC, Plaintiff was assigned a different preceptor on a weekly or daily basis. The following events occurred during Plaintiff's shadowing of various preceptors.[2]

In March 2021, Holly Oliver was assigned as Plaintiff's preceptor. On one occasion, Plaintiff was told to report to a certain room where a procedure was supposed to take place. Plaintiff reported to that room, but Ms. Oliver was not there. Plaintiff then went to another room to help with different procedures. At some point later that day, Ms. Wood discovered that Plaintiff was not with Ms. Oliver and asked why. Among other things, Plaintiff told her that she did not

---

[2] For many of the incidents below, Plaintiff only provides approximate dates or no dates at all. So to the extent the sequencing is not quite right, that falls upon Plaintiff failing to provide exact dates and details about events.

6

know where she was and only later discovered that she was in a different room than Plaintiff was told to report to. Ms. Wood then told Plaintiff to find Ms. Oliver and then for the two of them to report back to Ms. Wood. When they reported back, Ms. Wood scolded Plaintiff for not being with her preceptor and counseled her on the rules concerning what she should be doing and where she should be. Ms. Wood said nothing to Ms. Oliver.

On some occasions, Ms. Wood would assign Plaintiff to a particular room, but the preceptor would tell Plaintiff she was supposed to be in another room. At times, the preceptors would tell Plaintiff they did not want to work with her. On some occasions, even though Ms. Wood was responsible for writing preceptor assignments on a whiteboard, the preceptors would take Plaintiff to another room and change the whiteboard assignment accordingly. When that happened, Ms. Wood would not say anything.

At the start of work shifts, around 7:10 a.m., the GI Unit would meet in a huddle to discuss what was scheduled for the day. On several occasions, Plaintiff was late to the huddle because she could not find scrubs that fit her and had to go to another room to get scrubs that fit her. According to Plaintiff, sometimes when Plaintiff was late to the morning huddle, Ms. Wood would not say anything because Ms. Wood was "getting onto" somebody else. But on other occasions, even if Plaintiff was not late to the huddle, she would get called out by Ms. Wood. According to Plaintiff, the only other employees she remembers being called out for being late were an African-American and an Asian colleague.

During her time at KCVAMC, Plaintiff found that her colleagues were constantly changing how they did procedures. Each preceptor wanted the procedures to fit his or her individual standard, rather than going by the standard operating procedures. Plaintiff complained to Ms. Wood about these changes. But Ms. Wood told her, "do what your preceptors tell you to do."

7

On or around March 1, 2021, Plaintiff was accused of lying about her whereabouts. According to Plaintiff, this occurred around the same time she was accused of not being with her preceptor all the time. Ms. Wood apparently could not find Plaintiff, so she asked several employees to look for her. When Plaintiff was found, she claimed that she was doing online competency training. But according to Plaintiff, Ms. Wood then called her a liar in front of the group of employees.

On some occasions, Plaintiff felt she was bullied or demeaned by co-workers. For example, some preceptors would not let Plaintiff write down the information she needed to do her job or failed to provide her with the correct information.

Ms. Wood also repeatedly asked Plaintiff if she needed to go to the Employee Assistance Program (the "EAP"). The EAP apparently offered counseling services. When Plaintiff first told Ms. Wood about her son, Ms. Wood did not initially mention counseling services. But later during her employment, Ms. Wood asked Plaintiff if she needed to utilize the EAP. Plaintiff repeatedly told Ms. Wood that she did not need the EAP because she had been dealing with the murder for three years and was already in counseling. But Ms. Wood apparently kept asking about using it, and on one occasion, she apparently made a generalized reference about using the EAP in front of the entire huddle. According to Plaintiff, this occurred after Plaintiff brought her complaints about the "toxic" work environment to Ms. Wood's attention.

On April 13, 2021, Ms. Wood refused to allow Plaintiff to change her schedule. Plaintiff asked whether she and the other MITs could work a later shift to learn the complete job. Ms. Wood told her that she would never do that. When Plaintiff noted that shift changes had been done before, Ms. Wood said she would not change the schedule for Plaintiff and several other MITs. Those other MITs were African-American and Asian.

On April 22, 2021, Plaintiff stayed late after a procedure had finished because her preceptor told her to do so. When Ms. Wood texted her and asked why she was staying late, Plaintiff responded that it was because her preceptor told her to do so. Ms. Wood then responded, "okay."

On June 14, 2021, Frank Palmisano—who apparently was a preceptor—told Plaintiff that he was going to do what he wanted to and that the MITs would have to learn from him. He also told Plaintiff she was asking too many questions. And he also told her that if she did not understand how to clean a scope, she did not belong at the KCVAMC. Plaintiff found these comments to be demeaning.

On or around August 3, 2021, Ms. Wood spoke to Plaintiff about her leave usage. On August 5, 2021, Ms. Wood emailed Plaintiff thanking Plaintiff for meeting with her. In the email, Ms. Wood also noted that Plaintiff had used nearly fifty-four hours of unplanned leave. The email documented the days she missed and how the missed days were categorized for time keeping purposes. *See* ECF No. 22-9. Ms. Wood further stated:

> Due to your unplanned leave, it is impacting your orientation and may cause an extension of your orientation period. Understand that the unplanned time is a pattern and I would like you to monitor as future tardiness could result in disciplinary action. Please understand that future requests of running late, forgetting PIV cards, personal issues, bank/account issues these may be marked as AWOL. Reviewing this with you, you reported that this was a shock seeing on paper for the unplanned hours. As stated, please schedule those unplanned items in advance. I appreciate you saying your unplanned leave will improve, I look forward to seeing you continue to grow within GI.

*Id.* According to Plaintiff, this email contradicted what Ms. Wood told her at the start of her employment that she would not be penalized for court appearances, counseling, or other absences related to her family situation. Ultimately, Plaintiff's orientation was not extended, and she was not terminated.

9

On August 10, 2021, Ms. Wood gave Plaintiff a "dirty look." Plaintiff did not know why she was given the dirty look, and she did not respond to it. According to Plaintiff, Ms. Wood only gave dirty looks to other African-American MITs.

On August 18, 2021, Plaintiff's assigned preceptor walked off and left her without answering her questions. According to Plaintiff, some preceptors would even leave her during procedures. And Mr. Palmisano even refused to give her hands on training, despite giving training to another MIT.

On August 20, 2021, Ms. Wood sent Plaintiff an email about allegedly being late to a morning huddle. In that email, Ms. Wood stated:

> On 08/20/21 huddle started at 0710 and you were not present. Charge nurse discussed staffing for all techs and your name was called without answer. I have previously instructed you to be on duty ready, willing, and able to perform the functions of your position. I have previously stated if you are going to be late, you are to call the call in line to provide leave being utilized. This was not completed 08/20/21.
>
> You were previously advised in person as well as per emails below about tardiness as well as unplanned leave procedure. Due to your late arrival this am, you will be receiving 15 minutes of AWOL. As previously stated, you are required to arrive promptly to work, dressed out and ready for huddle by 0710.

ECF No. 22-8 at 1. This email was sent in response to other emails Ms. Wood had sent about Plaintiff's leave usage. *Id.* at 1–2. Plaintiff denies that she was late that day. According to Plaintiff, she was in the huddle, but she was in her street clothes because there were no scrubs available. According to Plaintiff, Ms. Wood still sent the above email even after learning that it was a different co-worker who was late to the huddle.

That same day, Ms. Wood accused Plaintiff of arguing with her. In response to the above email, Plaintiff tried to give Ms. Wood a fulsome response and explain the situation. But according to Plaintiff, Ms. Wood was not willing to listen and responded in an agitated manner.

10

On August 25, 2021, Ms. Wood scheduled another meeting with Plaintiff and set up a recurring meeting to happen every Friday thereafter. The meetings were to discuss how the week went and "to find out where [Plaintiff] would be placed the next week so that [Plaintiff and Ms. Wood] would be on the same page week to week."

On August 26, 2021, Ms. Oliver and Plaintiff participated in the same procedure. Ms. Oliver was Plaintiff's preceptor on that day. Ms. Wood congratulated Ms. Oliver on doing a good job on the procedure, but she said nothing to Plaintiff.

On August 31, 2021, Plaintiff and another MIT were practicing with a stent that was about to expire. Plaintiff and the other MIT thought that since KCVAMC did not use that type of stent very often, it was unlikely it would be used before it expired. But Ms. Oliver told Plaintiff and the other MIT that they should not be practicing with an unexpired stent, and she repeatedly told them to replace it. Ms. Oliver also told Ms. Wood, and Ms. Wood addressed it in a huddle.

On or around September 16, 2021, Plaintiff was told she needed to use sick leave to get her Covid-19 vaccination. Plaintiff did so. But Mr. Scholl later told Plaintiff that she would not need to use the sick leave after all. He also showed her how to make the change, and her sick leave was restored.

On September 19, 2021, during a morning huddle, Mr. Palmisano called Plaintiff out for using a red—instead of black—marker to indicate that a scope was clean. According to Plaintiff, another employee then pointed out to Mr. Palmisano that he had used a red marker in the past.

In October 2021, Plaintiff was exposed to Covid-19 and told to stay home until the symptoms subsided. According to Plaintiff, when she returned to work on October 11, 2021, she discovered that she had lost her time designated as leave without pay. Plaintiff believed that she should have been able to use a mix of annual or sick leave to cover the absence. Ms. Wood,

11

however, had designated Plaintiff as leave without pay rather than putting the leave time together from sick leave. Ms. Wood testified that if an employee did not have sufficient sick leave to cover an absence, she would typically mark the absence as leave without pay or absence without leave. At the time of her deposition in this case, Ms. Wood could not recall whether Plaintiff had exhausted her leave balance at the time.

MITs were required to perform a self-assessment as part of their performance evaluation. On October 15 and 18, 2021, Ms. Wood told Plaintiff she had not received her self-assessment. But Plaintiff had already turned in her self-assessment to Mr. Scholl.

According to Plaintiff, preceptors made disparaging comments about her and did not want to work with her for various reasons. Although she provides no dates for these incidents, a preceptor named Kelsey told Plaintiff that she did not like working with black people. This allegedly occurred when Kelsey was leaving right after she quit her job. Plaintiff claims that she told Ms. Wood about the incident, but she did nothing about it. On another unspecified date, Mr. Palmisano apparently told her she was too old to be in the field and should have started sooner. Plaintiff also claimed that Mr. Palmisano did not want to work with her because he thought he was the best at the job, and he did not want Plaintiff to make him look bad. In fact, on one or more occasions, Mr. Palmisano would try to show the doctors that Plaintiff was incompetent.

According to Plaintiff, there were also issues with the training and inconsistent directions. Plaintiff was told to do things the VA way, but she was not originally given the standard operating procedures despite asking for them. She only later received them after complaining. On other occasions, Ms. Wood provided Plaintiff with inconsistent information and directions, so she would have another person present to prove what Ms. Wood told her. At some point, Mr. Palmisano would leave her saying she should not be with him even though he was assigned as her preceptor.

On another unspecified date, Plaintiff complained to Ms. Wood about the lack of training with the job. She told Ms. Wood the training was unstructured, and trainers did not know how to properly train people. She also complained that the trainers were bullies to women of color. According to Plaintiff, minority employees were treated differently.

According to Plaintiff, Ms. Wood told Plaintiff that they would retain Plaintiff after the completion of her probationary period. Ms. Wood also told her after Plaintiff completed her one-year probationary period, Ms. Wood would approve Plaintiff's transfer to a different department in the KCVAMC. Ms. Wood also testified that that she never had any issues with the quality of Plaintiff's work.

On January 7, 2022, Plaintiff emailed Ms. Wood her two weeks' notice that she would be resigning on January 22, 2022. Her resignation was effective three days after she completed her one-year probationary period. Prior to resigning, Plaintiff did not tell Ms. Wood or Mr. Scholl that she was resigning.

Prior to resigning, Plaintiff made complaints about the work environment. On March 19, 2021, Plaintiff and her supervisor met with a union representative, but Plaintiff does not specifically say what was discussed. On August 11, 2021, after eight months at the KCVAMC, Plaintiff contacted the VA's Equal Employment Opportunity Division (the "EEO") with an informal complaint of workplace harassment.

After an informal resolution could not be reached, on October 26, 2021, Plaintiff filed a formal administrative complaint of employment discrimination. In her administrative complaint, Plaintiff expressly indicated in several spots that she was complaining of harassment/hostile work environment based on age and race. After reviewing the administrative complaint, the EEO issued a notice of acceptance that informed Plaintiff that the EEO construed her complaint as

13

raising a hostile work environment claim based on numerous incidents and two discrete employment discrimination claims. The EEO also told her that if she disagreed with that construction, she should let them know within seven days. Plaintiff did not object to the scope of issues identified, but she did provide some additional information about ongoing events. On April 15, 2022, the EEO issued an investigative report that also construed her claims in the same way described above.

On October 13, 2022, the EEO issued its final decision on Plaintiff's complaints, and she filed this lawsuit on January 11, 2023. In this case, Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ECF No. 1. More specifically, Plaintiff alleges seven claims: (1) race and color discrimination; (2) hostile work environment based on race and color; (3) retaliation for her complaints of age and race discrimination; (4) age discrimination; (5) hostile work environment based on age; (6) another retaliation claim for her complaints about age discrimination; and (7) constructive discharge. *Id.*

## Discussion

Defendant argues that he is entitled to summary judgment on all claims. For the retaliation and constructive discharge claims, Defendant argues that Plaintiff has failed to exhaust her administrative remedies on these claims. On the discrimination and hostile work environment claims, Defendant argues that it is entitled to summary judgment on the merits.

Before addressing these arguments, the Court must note a unifying deficiency in Plaintiff's briefing. Over the course of the last several years, Plaintiff's counsel has appealed several cases like this one to the Eighth Circuit. The plaintiffs in most of those cases also raised disparate treatment, hostile work environment, retaliation, and constructive discharge claims. The Eighth

14

Circuit routinely affirmed dismissal on the merits of claims because the plaintiffs' claims fell well short of the summary judgment standard. *See Sherman*, 158 F.4th at 907–10; *Woods v. Collins*, 150 F.4th 967 (8th Cir. 2025); *Martinez-Medina v. Rollins*, 144 F.4th 1091 (8th Cir. 2025); *Parker v. U.S. Dep't of Agric.*, 129 F.4th 1104 (8th Cir. 2025); *Davis v. McDonough*, No. 23-3419, 2025 WL 212065 (8th Cir. Jan. 16, 2025); *Hill v. McDonough*, No. 23-1797, 2024 WL 2890977 (8th Cir. June 10, 2024); *Tisdell v. McDonough*, No. 21-3658, 2023 WL 2486083 (8th Cir. Mar. 14, 2023); *Watson v. McDonough*, 996 F.3d 850 (8th Cir. 2021).

The Court relies on those decisions below because they state the general law that applies here, but they are also important because Plaintiff's counsel employs the same arguments and briefing tactics here that she used in those cases. For example, many of her arguments lack legal or record support. And other arguments rely on bald assertions, speculation, and conclusory allegations rather than evidence. So these decisions have controlling force on the merits issues addressed below.

And the Court also notes, even if it considered all the undisputed and otherwise properly supported facts from the paragraphs that violated the Local Rules in the ways noted above, it still would not change the outcome. Even with those facts and all reasonable inferences taken in Plaintiff's favor, the analysis below would be the same. At bottom, Plaintiff has not presented sufficient evidence to survive summary judgment on any claim. With these caveats in mind, the Court turns to the claims.

I.     **Plaintiff's retaliation and constructive discharge claims fail as a matter of law.**

Defendant argues that Plaintiff failed to exhaust her retaliation and constructive discharge claims because she failed to raise them in her formal EEO complaint of discrimination, and she again failed to amend her complaint with those claims after the EEO stated her claims solely as

hostile work environment and two discrimination claims. ECF No. 22 at 17–24. In discussion of the exhaustion issues, Plaintiff never refers to her retaliation and constructive discharge claims specifically; she mostly discusses the hostile work environment claims. *See* ECF No. 29 at 3–5.

Plaintiff has waived any opposition to Defendant's exhaustion arguments on her retaliation and constructive discharge claims. Defendant raised both these arguments thoroughly in his opening briefing based on controlling law and undisputed facts. Although she addresses exhaustion law generally based on citation to district court and out-of-circuit appellate cases, she does not specifically make a *legal* argument as to how her retaliation and constructive discharge claims are exhausted. To the contrary, the most specificity she provides on any claim is that "issues accepted for investigation were logically related" and "exhausted." ECF No. 29 at 3.

But as Defendant aptly notes, the claims submitted and investigated were only related to hostile work environment and two alleged acts of employment discrimination. Plaintiff's formal complaint of discrimination listed her claims as "harassment/hostile work environment" based on "race (blk)" and "age (over 40)." *See* ECF No. 27-2 at 2. In her attached typewritten narrative of incidents, she wrote in hand that "every issue here pertains to" with an arrow pointing to the typewritten words "HARASSMENT/HOSTILE WORK ENVIRONMENT." *Id.* at 3. In its notice of acceptance, the EEO then listed her claims as an alleged hostile work environment based on age and race as well as two acts of employment discrimination. *See* ECF No. 22-6 at 1–2. And although the EEO gave Plaintiff seven days to object to this construction if it was incorrect or incomplete, *see id.* at 2–3, she did not do so. The EEO's investigative report also listed the claims as an alleged hostile work environment based on age and race as well as the two alleged acts of employment discrimination. *See* ECF No. 27-21 at 3. So it is not self-evident how her constructive discharge and retaliation claims were exhausted.

And Plaintiff fails to provide any *legal* argument for how her exhausted claims are reasonably related to her retaliation and constructive discharge claims. While there could be something in the record to support such an argument, it is not this Court's job to hunt through the record to find the facts to support Plaintiff's arguments. *See Lee v. Collins*, 143 F.4th 921, 924 (8th Cir. 2025) (holding in an employment case involving Plaintiff's counsel that "we decline to search the record for evidence supporting [the plaintiff's] argument to that effect" because that is the plaintiff's "job, not ours." (internal quotation marks omitted)).[3] Plaintiff's failure to provide any meaningful legal analysis on this issue constitutes waiver. *See Satcher v. Univ. of Ark. At Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). And that alone is sufficient basis for Defendant to prevail on these claims. *See Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1054–55 (8th Cir. 2024); *Johnson v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 523 (8th Cir. 2020); *Slayden v. Center for Behavioral Medicine*, 53 F.4th 464, 468 (8th Cir. 2022).

But even if Plaintiff did not waive these arguments, she would still lose on the merits of the exhaustion arguments for the reasons Defendant states. *See* ECF No. 22 at 17–24. As noted above, these claims were not explicitly raised in the formal complaint of discrimination, notice of acceptance, or the investigative report. *See Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 853 (8th Cir. 2012) (looking at agency's correspondence in construing whether claims were exhausted). And the retaliation claim is not reasonably related to the exhausted claims. *See id.*

---

[3] The closest Plaintiff comes to addressing this issue at all is not even in her legal brief in opposition to summary judgment but only in her opposition to Defendant's statement of facts. There she claims that her formal complaint and attached "description of events" contains "events of a retaliatory nature." ECF No. 28 at 13. But then she cites generally to a nearly twenty-page single-spaced stream of consciousness narrative. *See id.* (citing ECF No. 27-2). She provides no pinpoint citations to the page or pages containing any claims of retaliation. Nor does she specifically state what events were of a retaliatory nature. This fails to conform with Local Rule 56.1(b)(1) and Rule 56(c)(1)(A) that in tandem require oppositions to facts to be supported by "citing to particular parts of materials in the record." And more fundamentally, it would take an incredible amount of time for the Court to sift through this document to find what—if any—evidence supports her claims of instances of a "retaliatory nature." But thankfully the Court need not do so because that is not the Court's job. *See ASARCO, LLC*, 762 F.3d at 754.

at 850–54 (holding that retaliation claims were not reasonably related to discrimination claims); *see also Slayden*, 53 F.4th at 468 (same); *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 539 (8th Cir. 2020) (same). The same is true for Plaintiff's constructive discharge claim. *See Slayden*, 53 F.4th at 469; *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1081 (8th Cir. 2021); *Voss v. Hous. Auth. of the City of Magnolia, Ark.*, 917 F.3d 618, 623 (8th Cir 2019).

But even if these claims were exhausted, they would also fail on the merits. The constructive discharge claim fails because it relies on largely the same evidence that—as the Court holds below—is insufficient to satisfy the even lower burden of proving her hostile work environment claims. *See Sherman*, 158 F.4th at 910 ("And because [the plaintiff] has failed to show that the events were severe enough to constitute a hostile work environment, she necessarily has failed to show that conditions were so intolerable that she was constructively discharged."); *Parker*, 129 F.4th at 1114 (same rationale).

Her retaliation claim also fails on the merits because she has not provided evidence that she suffered an adverse action or that any such alleged action was connected to her protected conduct. On the latter element, she vaguely references some timing of alleged actions. But the Eighth Circuit "generally requires more than a mere temporal connection in order to infer causation." *Parker*, 129 F.4th at 1114 (citation modified and quotation marks omitted). And here, Plaintiff has not "pointed to specific evidence that would allow a reasonable jury to conclude the timing of events suggests an unlawful motive." *See Sherman*, 158 F.4th at 909. Instead, like many of her other claims mentioned below, Plaintiff simply relies on bald assertions, speculation, and conclusory allegations to try to prove causation. That is insufficient. *See id.* at 908–09; *Martinez-Medina*, 144 F.4th at 1098–99. Thus, even if the Court were to consider Plaintiff's constructive discharge and retaliation claims on the merits, they would fail as a matter of law for

18

these reasons.

For these reasons, Defendant is entitled to summary judgment on Plaintiff's retaliation and constructive discharge claims.

**II.      Plaintiff's discrimination claims fail as a matter of law.**

Defendant argues Plaintiff only exhausted two discrete acts of discrimination, but they both fail under the burden-shifting framework set forth in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Without addressing the exhaustion issue, Plaintiff argues that a variety of discrete employment acts—not just the two exhausted discrete acts of discrimination—satisfy the prima facie elements for a discrimination claim. Plaintiff does not address the other two stages of the burden-shifting framework.

Since Plaintiff has presented no direct evidence of discrimination, the *McDonell Douglas* burden-shifting framework applies here. *Martinez-Medina*, 144 F.4th at 1096. At the first stage, Plaintiff must prove a *prima face* case of discrimination. *Id.* That means she must prove: "(1) that she is a member of a protected class; (2) that she was qualified for the position and performed her duties adequately; and (3) that she suffered an adverse employment action under the circumstances that would permit the court to infer that unlawful discrimination was involved." *Id.* (citation modified and quotation marks omitted). If Plaintiff makes this showing, then the burden would shift to Defendant "to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Id.* (quotation marks omitted). If Defendant meets that burden, then Plaintiff must prove that "the proffered reason is pretextual." *Id.* (quotation marks omitted). "While the proof necessary to establish a prima face case is minimal, [the plaintiff] must present more substantial evidence to establish pretext because evidence of pretext . . . is viewed in light of the employer's justification." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 805 (8th

19

Cir. 2019) (citation and internal quotation marks omitted).   "Despite this shifting of the burden of production, the plaintiff at all times bears the ultimate burden of persuasion."   *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019) (quotation marks omitted).

Plaintiff wholly ignores Defendant's argument that only two discrete acts of discrimination were exhausted.   Those alleged claims were: (1) on September 16, 2021, Plaintiff was forced to use sick leave to get her Covid-19 shot; and (2) on October 11, 2021, Plaintiff lost her leave without pay time.   These were the only two discrete acts included in the EEO's notice of acceptance and its investigative report.   *See Richter*, 686 F.3d at 851 ("Each discrete act is a different unlawful employment practice for which a separate charge is required."); *see also id.* at 853 (looking at EEOC correspondence to determine which claims were exhausted).   Since Plaintiff does not provide any meaningful legal analysis explaining specifically how any of the other alleged discrete acts she now tries to raise on summary judgment were exhausted, Defendant is entitled to summary judgment on those alleged acts.   *See Collins*, 108 F.4th at 1054.

The two exhausted claims fail as a matter of law.   On the first one regarding the use of sick leave for a Covid-19 shot, it fails at the prima facie stage for two reasons.   First, it does not appear to be an adverse action because she did not suffer "'some harm' to 'an identifiable term or condition of employment.'"   *Martinez-Medina*, 144 F.4th at 1096 (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024)).   It is undisputed that Plaintiff's sick leave for this was fully restored, so she suffered no adverse action at all.   *See id.* ("There is no evidence that [the plaintiff] suffered termination, a reduction in pay or benefits, or some other discriminatory effect due to her employer's actions."); *see also Woods*, 150 F.4th at 972 ("But [the plaintiff] points to no evidence that his 2020 appraisal was used as a basis for a reduction in pay, transfer, or other change to a term or condition of his employment.").   Second, even if there were an adverse action, Plaintiff

20

fails to present any *evidence*—as opposed to bald assertions, speculation, and conclusory allegations—that this alleged action was in any way motivated by Plaintiff's race, color, or age. *See Sherman*, 158 F.4th at 907–09; *see also Parker*, 129 F.4th at 1112.

The second adverse action regarding categorizing one of her absences as leave without pay fails at two distinct stages. Even if this could be considered an adverse action, Plaintiff still fails to make a prima facie case because she provides no *evidence*—only bald assertions, speculation, and conclusory allegations—that the basis for this lost time was in any way connected to her race, color, or age. *See Sherman*, 158 F.4th at 907–09; *see also Parker*, 129 F.4th at 1112. Along those same lines, even if Plaintiff could satisfy the prima facie case elements, Plaintiff cannot show pretext. Defendant stated that it would mark absence as leave without pay or absent without leave if there was insufficient sick or leave time for an absence. This would be a legitimate, nondiscriminatory reason why Defendant may have marked leave without pay for the Covid-19 absence. While Plaintiff suggested in her response to Defendant's statement of facts that this may have been incorrect insofar as Plaintiff may have had sick leave at the time, she does not demonstrate that marking it as leave without pay was discriminatory. At most, Plaintiff shows that Defendant may have been mistaken in doing so. But proving pretext requires more than that; she must present evidence that discrimination was the real reason for the alleged action. *See Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 809 (8th Cir. 2020); *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir. 2013). That she has not done. In fact, she presents no legal argument on this issue at all. She merely recites the prima facie elements and lists a variety of alleged adverse actions without presenting *any* evidence that would suggest pretext for discrimination on this issue. Thus, Plaintiff's claims on these two alleged adverse actions fail as a matter of law.

Even if Plaintiff exhausted the remaining discrete employment actions she lists in her brief, they would also fail for the same reasons that Plaintiff's exhausted claims fail. Plaintiff presents no evidence or meaningful legal argument demonstrating that these alleged actions were adverse employment actions, and even if they were, that they were motivated by discrimination. *See Martinez-Medina*, 144 F.4th at 1096; *Woods*, 150 F.4th at 972; *Sherman*, 158 F.4th at 907–09; *see also Parker*, 129 F.4th at 1112. Instead, she simply rattles off a variety of alleged incidents in two short paragraphs and makes bald, conclusory, and sporadic assertions that some of these actions were done because of her race or age. But that is not enough. *See Sherman*, 158 F.4th at 907–09; *see also Watson*, 996 F.3d at 855–56 (rejecting the plaintiff's attempt to "aggregate the individual events she takes issue with to find an adverse employment action."); *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) ("[The plaintiff] simply recites a list of actions that [her supervisors] took against her, and claims they were taken because she is a woman.").

For examples, at times, Plaintiff provides conclusory statements that she suffered some alleged employment action and that other "Caucasian employees" did not suffer the same action. Assuming that this conclusory statement is Plaintiff's attempt at showing alleged similarly situated evidence, she falls well short of demonstrating that a "comparator employee [was] similarly situated [to her] in all relevant respects," but the comparator employee was treated differently. *See Woods*, 150 F.4th at 972; *see also Collins v. Kansas City Missouri Pub. Sch. Dist.*, 92 F.4th 770, 772 (8th Cir. 2024). In fact, Plaintiff does not cite this standard at all, let alone point to specific record evidence proving the standard is met. Likewise, her conclusory claims about stray "ageist" or "racist" comments from her colleagues meet a similar fate because she does not describe them in detail, cite the applicable standard for such comments, or show how any alleged comments from her colleagues meet those standards. *See Twymon v. Wells Fargo & Co.*, 462

22

F.3d 925, 934 (8th Cir. 2006) (stray comments from *decisionmakers* that were unrelated to the decisional process were not enough to prove discrimination); *see also Huber v. Westar Foods, Inc.*, 139 F.4th 615, 622 (8th Cir. 2025) (similar).

For all these reasons, Plaintiff's discrimination claims fail as a matter of law.

### III.  Plaintiff's hostile work environment claim fails as a matter of law.

Defendant argues that Plaintiff's hostile work environment claim fails to meet the exacting standard for proving such a claim.  Plaintiff briefly cites the standard and then provides a conclusory and generalized two-paragraph explanation of how her claim survives summary judgment.

To prove a hostile work environment claim, Plaintiff must demonstrate that: "(1) she is a member of the class of people protected by Title VII; (2) she was subject to unwelcome harassment; (3) the harassment resulted from her membership in the protected class; and (4) the harassment was severe enough to affect the terms, conditions, or privileges of her employment." *Parker*, 129 F.4th at 1113 (citation modified and quotation marks omitted); *see also Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922 (8th Cir. 2023) (same standard under the ADEA).   While any race or age-based "harassment in the workplace is unreasonable and may, in turn, have the effect of interfering with an employee's performance," *Parker*, 129 F.4th at 1113 (citation modified and internal quotation marks omitted), Plaintiff must present evidence sufficient for "a reasonable jury" to "find that the work environment was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Sherman*, 158 F.4th at 910 (citation modified and quotation marks omitted).

"The conduct must be extreme in nature and not merely rude or unpleasant; it must be so intimidating, offensive, or hostile that it poisoned the work environment." *Sherman*, 158 F.4th at 910 (internal quotation marks omitted). The issue of severity "involves both objective and subjective components. It requires that the harassment be severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must subjectively believe her working conditions have been altered." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (citation omitted). "'The standard for demonstrating a hostile work environment under Title VII is demanding and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'" *Woods*, 150 F.4th at 973 (quoting *Martinez-Medina*, 144 F.4th at 1098).

Plaintiff loses on this claim before even getting to the merits. Plaintiff's legal argument on this issue is only a page-and-a-half. *See* ECF No. 29 at 5–6. The brief only relies on a single Eight Circuit case to recite the prima facie elements and a few out-of-circuit precedent to further explain some of those elements. *Id.* The brief then generally references "24 events" without specifically discussing any of these incidents or how they individually or cumulatively meet the demanding standard for hostile work environment claims. This stands in stark contrast to what Plaintiff's counsel provided in the *Sly* case where she at least cited the evidence to support her claims for hostile work environment. *See Sly*, No. 4:24-cv-00448, ECF No. 22 at 6–7, 13–17. Here, on the other hand, Plaintiff leaves it to the Court to comb through the record to identify the twenty-four acts and apply the demanding standard to those acts to find that her claim survives. But that is her job, not the Court's. *See Lee*, 143 F.4th at 924.[4] And because she failed to provide

---

[4] For example, one of the pieces of evidence that Plaintiff briefly references without any citation is a nearly twenty-page single-spaced stream of consciousness narrative. *See* ECF No. ECF No. 27-2 at 3–22. As noted above in the exhaustion section, it would take an incredible amount of time for the Court to sift through this document to find what—if any—evidence supports her claims for hostile work environment. But again, that is not the Court's job.

24

meaningful factual and legal analysis on how her claims survive the demanding standard, the Court finds that she waived her arguments on this issue to the point that Defendant is entitled to summary judgment on this basis alone. *See Collins*, 108 F.4th at 1054.

But even if the Court were to overlook this fatal deficiency, her claim would still fall well short of meeting the demanding hostile work environment standard. Assuming for the sake of argument that Plaintiff meets the first two elements of the hostile work environment claim, she does not come close to meeting the remaining two elements for three reasons. First, there is no evidence—only bald assertions, speculation, and conclusory allegations—that any of the alleged incidents she suffered were the result of membership in the protected class. *See Woods*, 150 F.4th at 973 ("These points do not further his claim because he offers little more than speculation and conjecture the incidents had anything to do with race."); *Parker*, 129 F.4th at 1113 (same).

Second, the alleged incidents do not meet the severity or pervasiveness requirements. *See Woods*, 150 F.4th at 973. Instead, even when considered in the light most favorable to Plaintiff, the evidence mostly shows that Plaintiff had "personality conflicts with numerous coworkers and superiors." *Parker*, 129 F.4th at 1113 (quotation marks omitted). And while some of the actions or statements in the record are rude, offensive, and unfortunate, the evidence still falls well short of the severity or pervasiveness that is required to survive summary judgment. *See Sherman*, 158 F.4th at 910; *Martinez-Medina*, 144 F.4th at 1098.

Third, Plaintiff has not shown that the alleged incidents affected a "term, condition, or privilege of her employment." *Parker*, 129 F.4th at 1113 (quotation marks omitted). For example, she has not shown that her pay grade or salary changed or she suffered a similar consequence because of the alleged harassment. *Id.*; *see also Watson*, 996 F.3d at 856.

---

*See ASARCO, LLC*, 762 F.3d at 754.

25

For all these reasons, Plaintiff's hostile work environment claim fails as a matter of law.

## Conclusion

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Date:  March 20, 2026          /s/ Greg Kays
                               GREG KAYS, JUDGE
                               UNITED STATES DISTRICT COURT